# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00810-CR

**Charles Jason Douthitt, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BLANCO COUNTY, 33RD JUDICIAL DISTRICT
### NO. 742, HONORABLE CHARLES J. HEARN, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Charles Jason Douthitt guilty of intoxication manslaughter, for which the court assessed fifteen years' imprisonment. Tex. Pen. Code Ann. § 49.08 (West 2003). Appellant contends the district court reversibly erred by admitting the results of field sobriety and intoxilyzer tests. He also contends the court erred by admitting retrograde extrapolation testimony based on the intoxilyzer test results. We conclude that the latter contention has merit, but we find that the error does not require reversal. Therefore, we will affirm the conviction.

*Facts*

Appellant, Ryan Meredith, Brian Cole, Chad Jones, and Jones's girlfriend went tubing on the Guadalupe River on the afternoon of June 23, 2001. Meredith estimated that they were on the river for about four hours, while Cole estimated the time at six to eight hours. Both witnesses testified that the group consumed a large amount of beer. Meredith remembered buying a "bunch of beer" and personally drinking about twelve cans. Cole said each person purchased a twelve-pack and that he drank about fifteen beers. Meredith, Cole, and Jones each admitted being intoxicated when he left the river. The witnesses said that appellant had also been drinking, but they professed not to know how much appellant drank over the course of the afternoon.

Appellant, Meredith, and Cole had driven to the river in appellant's black Mustang. Jones and his girlfriend were in another car, and the plan was for appellant to follow Jones back to San Marcos. Jones testified that as they drove away from the river, appellant "was speeding up and slowing down and then speeded up to pass me." Jones testified that he did not believe that appellant was intoxicated, but he admitted that he had testified to the contrary before the grand jury. After appellant passed Jones, the two vehicles became separated and appellant, who was visiting from Houston, became lost.

The evening was growing dark when, at about 8:40 p.m., appellant and his companions found themselves driving west on ranch road 32 at its intersection with U.S. highway 281 south of Blanco. Appellant stopped at the intersection, then began to turn left, or south, onto highway 281. He entered the intersection immediately in front of a northbound motorcycle. The

2

rider, David Sellers, was thrown from the motorcycle when it struck the front of appellant's car. The force of the impact seriously damaged the Mustang, tearing off the front bumper and leaving it without headlights. Appellant and his companions did not stop to assist Sellers, who died from his injuries. Although there were no other witnesses to the accident itself, other motorists on highway 281 stopped and called 911 after they saw the wrecked motorcycle and appellant's damaged car leaving the scene.

Meredith and Cole estimated that the accident occurred between one and one-and-a-half hours after they and appellant left the river to return to San Marcos. Meredith testified that all the beer purchased that day was consumed on the river and that no further drinking took place after they left the river. Cole testified that he brought five cans of beer to the car after leaving the river, and that he, Meredith, and appellant drank them as they drove. Cole recalled that appellant drank only one of these beers, and that he finished it about forty-five minutes before the collision. Meredith and Cole each testified that he did not believe that appellant was intoxicated at the time of the accident, but Cole acknowledged saying in an earlier statement that everyone in the car was "pretty drunk." Both witnesses agreed that neither they nor appellant had anything alcoholic to drink after the accident.

After the collision, appellant drove south on highway 281. The Mustang was "making noise" and driving "pretty rough." Appellant stopped at a convenience store at the ranch road 306 intersection, where he and his companions attempted to call Jones. Security system photographs introduced in evidence show appellant, Meredith, and Cole at the store at 9:55 p.m.

3

Another person who was at the store testified that the Mustang "looked like it hit a deer" and "was making a loud metal to metal [sound], like the fan was in the radiator."

After their attempts to call Jones were unsuccessful, the three men returned to appellant's car and turned east onto ranch road 306. Maria Guerreo, who was at that time driving north on highway 281, testified that a dark Mustang with no headlights and turning east onto ranch road 306 "pulled out in front of me and almost hit me. I had to slam on my brakes." Appellant drove down ranch road 306 until his car broke down. He and his friends got out of the car and began walking. Appellant fell behind Meredith and Cole. He was stopped and taken into custody by sheriff's deputies as he walked along the road a few hundred yards from his abandoned vehicle. The deputies testified that appellant was unsteady on his feet and smelled of alcoholic beverage. His speech was slurred and his eyes were bloodshot and glassy. Both deputies were of the opinion that appellant was intoxicated.

At about 10:30 p.m., appellant was returned to the accident scene by one of the deputies and turned over to Department of Public Safety Trooper Duane Zurovec. Zurovec testified that appellant had an odor of alcoholic beverage on his breath, his eyes were watery and bloodshot, and his speech was slurred. Because he was otherwise occupied, Zurovec did not conduct field sobriety tests until about 12:30 a.m. In the horizontal gaze nystagmus test, all six clues were indicative of intoxication. Appellant also was unable to maintain his balance during the walk and turn test, another indication of intoxication. On the other hand, Zurovec was of the opinion that appellant passed the one-leg stand test. Two police videotapes of appellant at the accident scene,

4

one showing him standing by the road soon after he arrived with the deputy and the other showing him performing the field sobriety tests, were introduced in evidence and viewed by the jury.

After the field tests, Zurovec formally arrested appellant and advised him of his rights. Zurovec then took appellant to the sheriff's office in Johnson City where, at 1:20 a.m., he administered an intoxilyzer test. The test showed that appellant's alcohol concentration was 0.13.

Zurovec prepared an inventory of the contents of appellant's Mustang. Among the items found in the car was an open 1.75 liter bottle of Jack Daniel's Down Home Punch that contained a trace amount of liquid. The label on the bottle indicated that the product had an alcohol content of 5.9 percent by volume. Cole testified that he, appellant, and Meredith drank Jack Daniel's Punch as they drove to the river that day, but he remembered putting the empty bottle in a trash can.

Antonio Ortiz was the technical supervisor for the district breath testing program. Called by the State, he was asked this hypothetical question:

> If the subject had not consumed any additional alcohol an hour before the accident, and did not consume any additional alcohol during the four hours subsequent to the accident, and tested a .13 at that time four hours later, can you draw any conclusions about his blood alcohol level at the time of the accident?

Ortiz replied that the body "breaks down alcohol at a rate of about .02 an hour" and thus "over four hours the liver would metabolize, burn, the equivalent of four beers, or .08. So that much alcohol would have been removed from the body during those four hours."

The prosecutor told Ortiz, "I don't want to get a specific number from you." He then asked the witness if, under the circumstances reflected in the hypothetical question, "would the

5

concentration at the time of the accident, in your opinion, be at least .13 or greater?" Ortiz answered, "Yes." Asked to explain his answer, Ortiz stated that studies with which he was familiar indicate that "the concentration of alcohol in a person's body after they stopped drinking will reach a peak within 30 minutes to an hour and then, allowing for that last drink that they had, then start to decline." According to Ortiz, the rate of decline will vary slightly between individuals, but is constant for any one individual.

During cross-examination, defense counsel posed his own hypothetical question:

> The hypothetical situation being that there's an accident at, say, 8:30 p.m., and following that accident, at some time over the next 30, 45 minutes or an hour . . . a person in that accident consumes up to 1.75 liters of some alcoholic substance . . . whether it be beer, a wine cooler, something containing alcohol. . . . Then they're tested, now, like three and a half hours after that. . . . Would those results have any validity anymore?

Ortiz answered that, assuming the substance consumed was beer, 1.75 liters would be approximately eight beers and "that would put in his body .16 of alcohol." If that is all the person had to drink, Ortiz said that four hours later "I would expect that person to have the equivalent of . . . four beers, which would be about .08."

The indictment alleged that appellant operated a motor vehicle in a public place while intoxicated and, by reason of that intoxication, caused David Sellers's death by accident or mistake. Tex. Pen. Code Ann. § 49.08 (West 2003). The indictment alleged that appellant was intoxicated under both definitions of that term; that is, he did not have normal use of mental and physical faculties due to the consumption of alcohol, and his alcohol concentration was 0.08 or more. *Id*.

6

§ 49.01(2). The court's jury charge incorporated both definitions, and the jury returned a general verdict of guilty.

## *Discussion*

Appellant brings forward four issues by which he contends the evidence regarding the intoxilyzer and field sobriety tests was erroneously admitted. He challenges the relevance of the breath test results (issues one and three) and the field sobriety test results (issue four), and the reliability of the retrograde extrapolation testimony (issue three). In a fifth issue, appellant urges that the erroneous admission of this evidence was harmful.

### *Intoxilyzer Test and Retrograde Extrapolation*

The proponent of scientific or technical evidence has the burden of demonstrating by clear and convincing evidence that the evidence is both reliable and relevant. *Hartman v. State*, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992); *Henderson v. State*, 14 S.W.3d 409, 411 (Tex. App.—Austin 2000, no pet.); Tex. R. Evid. 702. Broadly speaking, any evidence having a tendency to make the existence of a fact of consequence more or less probable than it otherwise would be is relevant. Tex. R. Evid. 401. In the case of expert testimony, the evidence must assist the trier of fact to understand the evidence or to determine a fact in issue. Tex. R. Evid. 702; *see Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000) (expert testimony must be sufficiently tied to facts of case). Scientific or technical evidence that is not shown to be reliable does not assist the trier of fact and is therefore irrelevant. *Morales*, 32 S.W.3d at 865; *Kelly*, 824 S.W.2d at 573.

7

Appellant does not challenge the reliability of the breath test results in this cause, but he urges that the results were irrelevant to the question of whether he was intoxicated at the time of the accident. This argument is related to appellant's further contention that the retrograde extrapolation evidence was not scientifically reliable. Because the reliability of the retrograde extrapolation speaks to the relevance of the test results, we turn first to the reliability issue.

Retrograde extrapolation is the technique by which alcohol concentration at some earlier time is estimated based on the results of testing at some later time. *Mata v. State*, 46 S.W.3d 902, 908-09 (Tex. Crim. App. 2001). In *Mata*, the court discussed the reliability of such evidence at length. The court explained:

> As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. The length of time necessary for the alcohol to be absorbed depends on a variety of factors, including the presence and type of food in the stomach, the person's gender, the person's weight, the person's age, the person's mental state, the drinking pattern, the type of beverage consumed, the amount consumed, and the time period of alcohol consumption. At some point after drinking has ceased, the person's BAC [blood alcohol content] will reach a peak. After the peak, the BAC will begin to fall as alcohol is eliminated from the person's body. The body eliminates alcohol through the liver at a slow but consistent rate.

46 S.W.3d at 909 (footnotes omitted). Thus, a drinker's alcohol concentration describes a curve that rises as the alcohol is absorbed, peaks at some point after drinking stops, and then declines as the alcohol is eliminated. *Id.* If a driver is tested for alcohol concentration while he is still in the absorption phase, his alcohol concentration will be higher than it was when he stopped driving. *Id.* If he is in the elimination phase when tested, his alcohol concentration could be either higher or

8

lower than while driving, depending on when he reached his peak concentration. *Id.* The greater the time between driving and the test, the greater the potential variation between the alcohol concentration when driving and the subsequent test result. *Id.* at 909-10.

After reviewing the scientific literature and court opinions from other jurisdictions, the *Mata* court concluded:

> [T]he science of retrograde extrapolation can be reliable in a given case. The expert's ability to apply the science and explain it with clarity to the court is a paramount consideration. In addition, the expert must demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and the risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science.
>
> The court evaluating the reliability of a retrograde extrapolation should also consider (a) the length of time between the offense and the test(s) administered; (b) the number of tests given and the length of time between each test; and (c) whether, and if so, to what extent, any individual characteristics of the defendant were known to the expert in providing his extrapolation. These characteristics and behaviors might include, but are not limited to, the person's weight and gender, the person's typical drinking pattern and tolerance for alcohol, how much the person had to drink on the day or night in question, what the person drank, the duration of the drinking spree, the time of the last drink, and how much and what the person had to eat either before, during, or after the drinking.

46 S.W.3d at 916.

Appellant argues that the retrograde extrapolation testimony in this cause was not shown to be reliable under *Mata* because only one intoxilyzer test was administered, the length of time between the accident and the test was excessive, and the State's expert witness was not shown to be familiar with appellant's personal characteristics.

9

The expert, Antonio Ortiz, acknowledged that two tests for alcohol concentration taken at least thirty minutes apart would have indicated whether appellant was in the absorption or elimination phase, a fact that could be critical in determining his alcohol concentration level at the time of the accident. As called for by the standard intoxilyzer protocol, however, appellant's breath was tested only once.[1] Ortiz testified that state regulations prohibit the repeated administration of intoxilyzer tests.

The breath test was administered approximately four-and-a-half hours after the accident. Given this passage of time, it stands to reason that appellant's alcohol concentration at the time of testing varied considerably from his alcohol concentration at the time of the accident. *Mata* points to a scientific study that suggests the potential for error increases substantially if extrapolation back one hour or more is attempted. *Id.* at 912.

Ortiz's extrapolation testimony was given in response to a hypothetical question from the State.[2] The question, quoted earlier in this opinion, included appellant's gender (by inference from the use of a masculine pronoun), but did not include his weight, his tolerance for alcohol, or how much he had eaten before, during, or after drinking. The hypothetical question assumed that appellant stopped drinking one hour before the accident and five hours before the test, but did not mention the amount of alcohol consumed or the rapidity of its consumption.

---

[1] During the test, appellant's breath was sampled twice within the space of three minutes. Ortiz explained that two samples are taken in this fashion to ensure that the intoxilyzer machine is functioning properly. This is, however, a single test for *Mata* purposes. *See Mata v. State*, 46 S.W.3d 902, 905 (Tex. Crim. App. 2001).

[2] The defense hypothetical did not call for or adduce retrograde extrapolation testimony.

10

Ortiz did not estimate appellant's alcohol concentration, either precisely or within a range, at the time of the accident. He merely testified that appellant's concentration would have been higher at the time of the accident than it was at the time of testing based on the assumption, included in the State's hypothetical, that appellant stopped drinking one hour before the accident. Ortiz testified that a person's alcohol concentration peaks thirty minutes to one hour after he stops drinking. The State urges that given this fact, Ortiz could reliably conclude that appellant's alcohol concentration peaked at or before the time of the accident and declined thereafter until the time the breath test was administered. Thus, argues the State, Ortiz's conclusion that appellant's alcohol concentration exceeded 0.13 at the time of the accident was reliable under *Mata*.

In its review of the scientific literature, the *Mata* opinion quoted academic opinion to the effect that "[t]he absorption profile of ethanol differs widely among individuals, and the peak [BAC] and the time of its occurrence depend on numerous factors." *Id*. at 911. Among these factors are the drinking pattern, the type of beverage consumed, the fed or fasted state, the nature and composition of foodstuff in the stomach, the anatomy of the gastrointestinal canal, and the mental state of the subject. *Id*. Ortiz did not state the basis for his assertion that alcohol concentration peaks no later than one hour after drinking stops, and he did not expressly acknowledge the possibility that the timing of peak concentration can be affected by such things as a heavy meal or the consumption of a large amount of alcohol in a brief period of time. None of these factors was incorporated into the hypothetical question propounded by the State.

Balancing the factors discussed in *Mata*, we conclude that the State failed to demonstrate by clear and convincing evidence that Ortiz's retrograde extrapolation was reliable.

11

Under the circumstances, the district court erred by admitting this testimony over appellant's objection.

Appellant contends that in the absence of reliable retrograde extrapolation, the intoxilyzer test results were irrelevant and should not have been admitted. He relies on the opinion in *Stewart v. State*, 103 S.W.3d 483 (Tex. App.—San Antonio 2003, pet. granted). *Stewart* was a prosecution for driving while intoxicated in which the defendant challenged the admission of the results of a breath test administered eighty minutes after she stopped driving. *Id*. at 485. The test showed an alcohol concentration of 0.15 at the time of the test, but the State's expert testified that he did not have sufficient information to determine whether the defendant's alcohol concentration would have been higher, lower, or the same at the time she was driving. *Id*. The San Antonio Court of Appeals held that without retrograde extrapolation to show whether the defendant's body was absorbing or eliminating alcohol at the time of the test, the test results were irrelevant to the question of her alcohol concentration when she drove. *Id*. at 486. The court held that by admitting the breath test results without expert testimony relating those results to the defendant's alcohol concentration at the time she drove, the trial court permitted the jury to engage in "its own crude retrograde extrapolation" and therefore base its verdict on facts not in evidence. *Id*.

There is an important distinction between *Stewart* and the cause before us. In *Stewart*, the State relied solely on the per se definition of intoxication.[3] *See* Tex. Pen. Code Ann. § 49.01(2)(B). Thus, the only question presented in that case was whether the breath test results

---

[3] We infer this from the absence of any reference to impairment in the opinion.

12

were relevant to the question of whether the defendant's alcohol concentration was at or above the level defining intoxication per se at the time she was driving. *See Stewart*, 103 S.W.3d at 486. In the instant cause, the State relied on the impairment definition of intoxication in addition to the per se definition. *See* Tex. Pen. Code Ann. § 49.01(2)(A). Thus, we must decide if the breath test results were relevant to prove either that appellant's alcohol concentration was at or above 0.08 at the time of the accident, or that his mental or physical faculties were impaired by alcohol at that time.

"[E]vidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990). The rules of evidence give the trial court considerable discretion in evaluating the probative value of proffered evidence, and an appellate court may reverse only for a clear abuse of that discretion. *Id.* at 378.

This Court has previously held in an unpublished opinion that retrograde extrapolation is not a prerequisite to the admission of intoxilyzer results. *Ball v. State*, No. 03-02-00037-CR, slip op. at 6, 2002 Tex. App. LEXIS 6293, at *8-9 (Tex. App.—Austin Aug. 30, 2002, pet. ref'd) (not designated for publication). Other courts of appeals have reached the same conclusion. *See Garcia v. State*, 112 S.W.3d 839, 850 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (collecting cases). Neither the opinions holding that breath test results are admissible without retrograde extrapolation nor the opinion in *Stewart* holding to the contrary have discussed the importance of considering whether the test results were offered to prove intoxication per se or intoxication by impairment.

13

Because appellant's intoxilyzer test was administered over four-and-a-half hours after the accident, the test results on their face arguably bore little or no relationship to appellant's alcohol concentration at the time of the alleged offense. *See Mata*, 46 S.W.3d at 909-10. The tenor, if not the text, of the *Mata* opinion suggests that without reliable retrograde extrapolation, the test results in this cause did not assist the jury in deciding whether appellant's alcohol concentration was at or above the per se level of intoxication at the time of the accident.[4] Assuming that to be the case, it does not follow that the test results were irrelevant to the question of whether appellant's faculties were impaired by alcohol at the time of the accident. The evidence required to prove each definition of intoxication is not mutually exclusive. *Daricek v. State*, 875 S.W.2d 770, 773 (Tex. App.—Austin 1994, pet. ref'd). A breath test result showing an alcohol concentration above the legal limit can be probative evidence of an impairment of faculties. *Id*.; *Garcia*, 112 S.W.3d at 850-51; *see Verbois v. State*, 909 S.W.2d 140, 142 (Tex. App.—Houston [14th Dist.] 1995, no pet.) (test results showing alcohol concentration of 0.11 two-and-a-half hours after driving were relevant to prove defendant consumed alcohol prior to driving).

There was testimony that appellant stopped drinking at least forty-five minutes before the accident and had nothing to drink after the accident. The test results showing that appellant's alcohol concentration was 0.13 at 1:20 a.m., five-and-a-half hours after he stopped drinking, were circumstantial evidence that appellant had consumed a large quantity of alcohol during the hours

---

[4] In *Mata*, the court stated that it was not deciding whether test results showing a defendant's alcohol concentration at some time after the alleged offense are admissible without retrograde extrapolation. *Mata*, 46 S.W.3d at 910.

14

preceding the accident.[5]  This, in turn, was a circumstance tending to show that appellant did not have normal use of his mental or physical faculties at the time of the accident because of excessive alcohol consumption, in the same way that appellant's reckless driving following the accident, the empty Jack Daniels Punch bottle found in appellant's car, and appellant's physical manifestations of intoxication when taken into custody were relevant to this question.  We hold that the district court did not abuse its discretion by overruling appellant's objection that the intoxilyzer test results were not relevant "in any way" to the question of his intoxication at the time of the accident.[6]

*Field Sobriety Tests*

Trooper Zurovec had appellant perform three field sobriety tests at approximately 12:30 a.m., almost four hours after the accident.  Appellant does not challenge the reliability of these test results insofar as they indicated that he was intoxicated at the time they were administered, but he contends the field test results were not relevant to the question of his intoxication at the time of the alleged offense because of the four-hour delay.

Field sobriety tests do not measure alcohol concentration but instead reflect the degree to which the subject's normal mental or physical faculties are impaired by an intoxicant.  *See Emerson v. State*, 880 S.W.2d 759, 769 (Tex. Crim. App. 1994) (horizontal gaze nystagmus test is

---

[5]  One defensive theory was that appellant became intoxicated after the accident.  The existence of an alternative explanation for appellant's intoxication at 1:20 a.m. did not render evidence of that intoxication irrelevant.  It was the jury's task to weigh and choose from the alternative theories presented by the parties.

[6]  We need not decide if the breath test results would have been relevant had the State relied solely on the per se definition of intoxication.

15

reliable indicator of intoxication, but cannot be used to quantify test subject's blood alcohol content). Obviously, the value of such tests as direct evidence of impairment while the subject was driving declines with the passage of time. This does not mean, however, that the results of field sobriety tests are necessarily irrelevant whenever there is a substantial gap between the time the subject stops driving and the time the tests are administered. In the cause before us, appellant's failure of field sobriety tests administered approximately five hours after he stopped drinking was, like the results of the intoxilyzer test, circumstantial evidence tending to show that he did not have normal use of his mental or physical faculties at the time of the accident because of alcohol consumption. The district court did not, on this record, abuse its discretion by overruling appellant's objection that the field test results were not relevant to the question of his intoxication at the time of the alleged offense.

### *Harmless or reversible error*

Having concluded that the district court erred by admitting the retrograde extrapolation testimony, we turn to the question of harm. The error was not constitutional and therefore must be disregarded unless appellant's substantial rights were affected. *Bagheri v. State*, 87 S.W.3d 657, 659 (Tex. App. — San Antonio 2002) (*Bagheri I*), *aff'd*, 119 S.W.3d 755 (Tex. Crim. App. 2003) (*Bagheri II*); *see* Tex. R. App. P. 44.2(b); Tex. R. Evid. 103(a). Although the evidence was relevant only to prove appellant's intoxication per se, the sufficiency of the evidence to support a finding of intoxication by impairment does not alone determine whether the error was harmless. *Bagheri I*, 87 S.W.3d at 660-61. Instead, the issue is whether the erroneously admitted

testimony might have prejudiced the jury's consideration of the other evidence or substantially affected the jury's deliberations. *Bagheri II*, 119 S.W.3d at 763.

When applying rule 44.2(b), an appellate court must disregard the error if, after examining the record as a whole, it has fair assurance that the error did not influence the jury, or had but a slight effect. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). The reviewing court should consider the entire record, including testimony and physical evidence, jury instructions, the State's and defendant's theories, closing arguments, and voir dire if applicable. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The court should also consider the nature of the erroneous evidence and how it might have been perceived by the jury. *Id.* More specifically, the court should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. *Id.* at 356; *Solomon*, 49 S.W.3d at 365. Overwhelming evidence of guilt is relevant to this issue, but it is only one factor in the analysis. *Motilla*, 78 S.W.3d at 357.

In *Bagheri II*, the court of criminal appeals agreed with the court of appeals that the erroneous introduction of retrograde extrapolation testimony in that case was reversible error under rule 44.2(b). 119 S.W.3d at 764. Applying the analysis used in *Bagheri II*, we conclude that the erroneous introduction of the retrograde extrapolation testimony in this cause does not require reversal.

Retrograde extrapolation was not mentioned during jury selection. The panelists were told by the prosecutor that there would be intoxilyzer evidence but, in contrast to *Bagheri*, none of the panelists indicated that he or she would give special weight to such evidence or expressed any

17

view with regard to the subject of alcohol concentration. *See id.* at 764. During his opening statement, the prosecutor recited a lengthy list of evidence he said would prove appellant was guilty of intoxication manslaughter, but this listing did not include retrograde extrapolation testimony, expert or otherwise. Here again, this cause stands in contrast to *Bagheri*. *See id.* at 763.

The retrograde extrapolation testimony was offered through an expert, Antonio Ortiz, whose education and training were detailed for the jury. Much of Ortiz's testimony was related to the operation of the intoxilyzer machine. The witness also testified briefly about the effect of alcohol on the nervous system. We have already detailed his retrograde extrapolation testimony.

Ortiz's testimony was cumulative in the sense that there was other significant evidence of appellant's intoxication at the time of the accident. *Cf. id.* at 764. Appellant shared a 1.75 liter bottle of Jack Daniels Down Home Punch with his two companions as they drove to the river on the afternoon in question. Appellant and his friends each purchased and drank a twelve-pack of beer while floating on the river. Appellant's friends admitted being intoxicated when they left the river, and there is evidence that they and appellant continued to drink as they began the drive back to San Marcos. One of the persons in appellant's car admitted saying that appellant was intoxicated at the time of the accident, although he changed his opinion at trial. Appellant's decision to leave the scene of the accident was indicative of a person whose judgment was impaired. At about 10:00 p.m., just over an hour after the accident, appellant turned in front of an oncoming driver who was forced to slam on her brakes to avoid a collision. From the time he was taken into custody around 10:00 p.m. until he registered at 0.13 reading on the intoxilyzer at 1:20 a.m., appellant was observed by several police officers who testified to their belief that he was intoxicated. Finally, the

18

jurors viewed two videotapes of appellant made between 10:30 p.m. and 12:30 a.m., and they were able to draw their own conclusions regarding appellant's apparent intoxication.

Appellant's defense primarily sought to create a doubt as to whether the fatal accident occurred by reason of his intoxication. *See* Tex. Pen. Code Ann. § 49.08(a)(2). He also attempted to suggest that his later intoxication was the result of consuming alcohol after the accident. There was, however, little evidence to support this hypothesis and it was contradicted by the testimony of his friends who were with him at the time.

During his opening argument to the jury, the prosecutor called the jury's attention to the breath results and reminded them of Ortiz's testimony that an hour after drinking, "all alcohol in the body would've been absorbed." He continued, "That tells you what Mr. Ortiz testified to. That tells you that at the time of the accident, the blood . . . the breath alcohol level was . . . [0.13] or greater. At least. At least." The prosecutor also made a brief reference to Ortiz's retrograde extrapolation testimony during his closing argument, but he devoted most of this argument to an extensive summary of the evidence he said proved that appellant's faculties were impaired at the time of the accident.

In summary, the retrograde extrapolation testimony in this cause was elicited from an expert, but there is no indication that the jurors were predisposed to give such testimony greater weight than the other evidence before them. The retrograde extrapolation testimony was cumulative of other evidence of intoxication and was not given special emphasis by the State. Although the prosecutor did remind the jurors of Ortiz's testimony during his arguments, he did not claim special expertise for Ortiz or suggest that his testimony was alone sufficient to convict. *Cf. Bagheri II*, 119

19

S.W.3d at 763.  Given the strength of the State's case and the relative weakness of appellant's defensive theories, we can state with fair assurance that the erroneous admission of the retrograde extrapolation testimony had, at most, a slight effect on the jury.  We therefore conclude that the error should be disregarded.

The judgment of conviction is affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   January 29, 2004

Publish