# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00448-CR

**Macario Mejia Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 22ND DISTRICT COURT OF HAYS COUNTY
### NO. CR-19-0951-A, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Following a car accident in which two teenage girls were killed and three other individuals were injured, appellant Macario Mejia Hernandez was charged with twelve criminal offenses—two counts of murder, two counts of intoxication manslaughter, three counts of intoxication assault, two counts of collision causing death, and three counts of collision involving serious bodily injury.[1] A jury found appellant guilty of all charges, and the State abandoned the two counts of intoxication manslaughter before sentencing. Appellant opted for sentencing by the trial court, which sentenced him to thirty years in prison for each murder charge, five years for each charge of collision causing bodily injury, and ten years for each of the other five charges, with the sentences running concurrently. On appeal, appellant argues (1) that

---

[1] *See* Tex. Penal Code §§ 19.02(b)(3) (murder), 49.01(2) (definition of "intoxicated"), 49.04(c) (driving while intoxicated), 49.07 (intoxication assault), 49.09 (enhanced offenses and penalties); *see also Lomax v. State*, 233 S.W.3d 302, 303 (Tex. Crim. App. 2007) (felony DWI can be underlying felony required to convict defendant of "felony murder," which occurs if person causes another's death during commission of "a felony, other than manslaughter").

the trial court abused its discretion in admitting improper retrograde-extrapolation evidence and (2) that the evidence is insufficient to establish that he was intoxicated at the time of the accident. We affirm the judgments of conviction.

## SUMMARY OF THE EVIDENCE

At about 9:00 p.m. on April 27, 2019, a serious car accident occurred at the intersection of Windy Hill and the northbound I-35 access road in Kyle. Exhibits introduced at trial show that Windy Hill bridges over I-35 east to west, intersecting with the highway access roads at traffic lights on either side; the speed limit on Windy Hill is forty miles per hour. A Honda sedan driven by Mitchell Weissman had just entered the eastern intersection driving north when it was struck on the driver's side by a Dodge truck driven by appellant, who was driving east on Windy Hill. The accident occurred very close to a gas station, and surveillance video from the gas station was introduced into evidence. The video shows Weissman driving out of the gas station as his light turns yellow and continuing straight into the intersection soon after or just as the light turns red. The collision occurred almost immediately after Weissman entered the intersection. The State introduced evidence that appellant had been convicted three other times of driving while intoxicated—in June 2003, March 2010, and May 2010.

The collision caused severe damage to Weissman's car, pushing the side of the car more than twelve inches into the passenger compartment, especially in the area of the backseat. Amanda Johnson, Weissman's girlfriend, was in the front passenger seat, and his three daughters—H.W., P.W., and B.W.—were in the back. H.W. and P.W., who were sitting on the driver's side and in the middle, were pronounced dead at the scene; Weissman, his girlfriend, and B.W. survived with serious injuries. Weissman suffered fractured ribs and a punctured lung;

2

Johnson suffered a severe concussion and cervical and thoracic fractures; and B.W. suffered a concussion, a lacerated spleen, and a fractured leg.

Jonathan Smucker and his girlfriend were driving home that night when he noticed appellant's truck in front of them "driving sort of erratically, bouncing from one line to the other periodically." Smucker testified, "I wouldn't say hard-core swerving but minor deviations, like going over the double yellow line and then back over the white." After he witnessed that kind of driving "multiple times" over the course of "a minute, two minutes," he changed lanes to not be behind appellant because Smucker "just had a guess that it might be dangerous to stay behind." Smucker and appellant stopped next to each other at a red light on the west side of Windy Hill and I-35, heading east, and "as soon as" the light turned green, "the truck accelerated faster than" Smucker, continuing toward the light on the east side of the highway. Smucker knew that with the timing of the lights in the area, "if you accelerate at a standard pace" after the first light turns green, "the other side will turn green—green before you get to it." Smucker said, however, "It appeared that he would be going too quick to be able to stop if the light had changed or—the light was red as he was approaching, but he was going too quick to stop at that—that red light." Smucker believed that the light was red when appellant entered the intersection and hit Weissman's car. After watching the surveillance video, Smucker agreed that Weissman had driven straight into the intersection from a right-turn-only lane and had a red light when he entered the intersection.

Dominique Valerio, Smucker's girlfriend, testified that she also noticed appellant several times "driving out of the borders and then would overcorrect and then go back into the lane," saying she was "worried that [appellant] was a drunk driver when [she] saw that." Valerio was very familiar with the area and the timing of the traffic lights and, based on that knowledge

3

and the fact that appellant had accelerated "faster than traffic normally does in that area," she was confident that she remembered the "light being red when the truck went through it," although she watched the surveillance video and agreed that Weissman had entered the intersection on a red light. Valerio testified that she saw appellant pull into the gas station and get out of his truck after the accident but did not notice him approach Weissman's car.

Vanessa Tuttle was waiting at the same intersection when she saw appellant's truck coming "very, very fast" and hitting Weissman's car, which "flew into the air." Tuttle testified that the truck appeared to be driving faster than traffic in that area normally goes and estimated that it was going "at least 40 miles per hour." Franchesca Hughley was stopped at the intersection when she noticed "a really loud car, truck," which "just flew past us," "going straight through the red light." She said she initially noticed the truck in her rearview mirror because "I was like: Wow, that's a loud truck." After the accident, Hughley parked and went to see if she could help. She noticed appellant's truck parked at the gas station, so she went over to check on the driver, noticing that the truck's "front part was really bad," "smashed in in the front" and "bent on the inside." No one was in the truck, and no one returned to the vehicle while Hughley was there. Graciela Reyes was also at the intersection and noticed appellant's truck, which was ahead of her, because she heard him rev his engine "real loud" while they waited for the light to turn green. When the light turned green, he "peeled off" and "sped off quickly. Like, not just like a regular move-on." Reyes heard the accident occur, although she did not see it, so she parked and came over to check on the vehicles. She noticed appellant's truck parked nearby and empty. Martin Ebanks did not see the collision but was in the area and went to try to help. He saw appellant get out and walk around the front of his vehicle; the next time Ebanks looked over, appellant was gone, and Ebanks never saw him again that night.

4

Michael Weissman testified that he lived in Frisco and had been driving his family home from San Antonio when the accident occurred. H.W. was eighteen, P.W. was sixteen, and B.W. was twelve. He described stopping to get gas and pulling out from the gas station onto the access road. He could not recall everything, but he thought that the intersection was "[p]retty close" to the driveway he used. He also "recall[ed] the light being green" as he pulled out of the gas station and thought the light was green as he approached but said, "Possibly could have turned yellow. I'm not sure." He testified that he had watched the video of the accident but that his recollection had not changed after watching it.

Ann Gonzales was driving northbound at the intersection and saw Weissman's vehicle leaving the gas station. She proceeded through the intersection and heard "an engine revving kind of, like, real loud like as if somebody was speeding up. And then by the time [she] looked back, the truck had already struck the car." Gonzales never heard any braking sounds, "no attempting to stop, no squealing, no slowing down," "[j]ust straight impact." Gonzales testified that she had remembered the northbound light as being green, but after watching the video, she realized it had turned red shortly before the accident.

When Sergeant Jonathan Akers responded to the car accident, witnesses told him that the Dodge pickup truck parked in the nearby lot had struck Weissman's sedan. Akers did not find the driver of the truck at the scene and was told by witnesses that "a male subject exited that vehicle and walked away from it." One witness described the driver as an "older Hispanic male with long hair pulled back into a ponytail and a long salt and pepper beard," a description that matched appellant's appearance on the night he was arrested. Officers could not find anyone in the area matching the description, so Akers looked in the truck and found a document addressed to appellant, then looked him up in public records to find an address and a photograph

5

that matched the witness's description of the driver. Akers went to the address and took custody of appellant. Appellant was read his rights and transported to a hospital to be checked for injuries from the crash and to have his blood drawn under a search warrant. Akers's bodycam video shows that when appellant made a mild complaint about his shoulder while being handcuffed, Akers responded, "Well, maybe you shouldn't have killed two kids." However, Akers did not ask appellant about the crash, and he did not recall appellant saying anything during the ride. Akers testified that he noticed "the odor of an alcoholic beverage emitting from him—his person" and that he told another officer that appellant "reeked of—of booze."

Sergeant James Jones, the crash-team commander, testified that Akers contacted him to report "a strong odor of an alcoholic beverage coming from [appellant's] breath." Jones sought and obtained a warrant for a blood draw based on that information, witness statements about appellant's driving, and the fact that he left the scene. Jones also interviewed appellant, who admitted to drinking six beers between about 1:00 p.m. and 6:00 p.m., when he said he stopped drinking. Weissman's possible running of a red light did not affect Jones's view of the case. In fact, he testified that even if appellant had had a green light, based on witness statements, appellant's behavior and statements when arrested, and his blood-draw results, appellant had been driving while intoxicated and "caused the death of two people."

Detective Pedro Carrasco, Jr. interviewed appellant at the hospital. Carrasco testified that appellant initially asserted that he had been asleep all night, that he was not sure what had happened, and that he "was just trying to kind of figure out what was going on." At the beginning of the interview, appellant said that he had drunk about four beers throughout the day before going to bed at about 8:00 p.m.; that he "rarely" drove his truck "because he's not supposed to due to not having a driver's license"; that he had not driven the truck that day; and

6

that "it appeared that someone had stolen the vehicle," claiming that he always left a key in the vehicle "due to some type of mechanical error with the ignition." Carrasco then disclosed that appellant had been described by witnesses and that Carrasco knew "there was a little bit more to the story than he was leading on." The detective asked, "Do you remember if your light was green or not," indicating that it looked like Weissman had run a red light, and appellant answered, "Yeah, I had a green light." Appellant said that he had had an argument with his girlfriend, so he went to the local Home Depot "for a brief amount of time." On his way home, appellant said that "he did get on it," which Carrasco took to mean that appellant "was driving fast." After the crash, appellant said, he parked and got out of his truck, saw that other people were helping, and ran and hid in the bushes because "he became scared" when the police arrived.

Maria Calderon, appellant's girlfriend of eleven years, testified that at about 9:00 p.m., she spoke on the phone to appellant, who said he was going to get something to eat. Not long after that, he called and asked her to pick him up "[b]ecause his truck broke." Calderon drove past the accident and saw appellant's truck parked at the gas station when she turned around looking for him. She found him walking along a road near where the accident had occurred but did not realize that his truck had been in the accident—she "just thought it was stalled"—and appellant did not tell her he had been involved in the accident.

Brian Fennell, who has worked in auto repair for twenty-five years, examined the vehicles after the crash and testified about the severe damage sustained by Weissman's sedan as shown in photographs introduced into evidence. He said that the C pillar, which connects the rear door and the rear window, was "pushed into the—seating area." Detective Perry Field, a patrol officer on the night of the crash, said that Weissman's sedan was "about 20 or 30 feet onto Windy Hill," facing west on the eastbound side of the road. "[T]he driver's side back door had

7

been impacted approximately 27 inches into where this rear passenger seat was," and the child who had been sitting in that seat was leaned over the lap of the child in the middle. Field was asked whether the surveillance video shows that Weissman entered the intersection on a red light. He answered, "Not when he enters the intersection from my perspective, sir," explaining:

> The northern most parking lot from the Exxon is very close to that intersection. And coming out of it, from me watching the video, it appears that Mr. Weissman enters the intersection as the light is yellow and then turns red as he's entering into it, like after he's already—so he's got inside of it. Then it turns red on him.

Sergeant Daniel Gooding of the Kyle Police Department is certified as a collision reconstructionist. He testified that skid marks at the scene indicate that the collision pushed Weissman's car sideways at a minimum speed of forty miles per hour. On cross-examination, defense counsel asked if, because Weissman's car spun around, Gooding should have used a different brake-efficiency number, which would result in a speed of thirty-six miles per hour. Gooding said it was possible the car had done so, which would result in the lower estimate.

Appellant's blood draw was performed at 12:39 a.m., about three hours after the accident. Kendall Stump is a forensic scientist who testified about the blood-alcohol testing performed on appellant's blood sample. She testified that another scientist, who had since retired, did an initial analysis of the blood sample, so Stump "went back to the instrument," "got the raw data," and "did [her] own data analysis to come up with an alcohol concentration separate from his report." According to Stump's analysis, appellant had a blood-alcohol concentration (BAC) of 0.108. Stump testified about how the human body absorbs alcohol, saying, "There's not an average absorption rate. It can differ from person to person, so it's hard to tell an average and say how—how quickly or slowly something will be absorbed. There's so

8

many different factors: food in your stomach, how slowly, quickly you're drinking." Appellant's attorney objected, "We don't know what her expertise is or isn't. I know what's being set up here, for her to do a retrograde extrapolation." The State responded that it was not asking for a retrograde extrapolation and that Stump would not testify about her extrapolation of appellant's BAC at the time of the accident.

The trial court held a hearing, during which Stump testified to her training, knowledge, and experience related to how the human body absorbs alcohol, and defense counsel asked whether an expert in the field had noted that the absorption phase can range "anywhere from 14 minutes up to 138 minutes" and that "short-term fluctuations . . . occur during absorption." Stump agreed that "even if we take your 138 minutes," she could "confidently say [that] after two, two-and-a-half hours someone is only eliminating their alcohol." At the conclusion of the hearing, the trial court said it disagreed that Stump was going to provide retrograde extrapolation testimony, stating:

> She can testify that the body—the alcohol levels tend to—tend to diminish when the body is eliminating alcohol. I mean, that's—that's a fair—that's a general principle. But she can't testify as to how much she thought he had to drink when he quit drinking at six o'clock or how—you know, what it should have been or what the extrapolation, as you say, would have been as far as, you know, was he .25 or whatever. She can't testify as to that. That would be extrapolation.

> But she's not going to be able to—I'm not going to allow her to testify as to what her opinion was as to how much he may have had or what the result might have been four hours earlier or three hours earlier, whatever it might be. But she can testify that the body—let's—I mean, everybody knows that the body metabolizes alcohol. And I'm going to let her testify as to that.

Stump then explained to the jury how alcohol is absorbed:

9

> The human body absorbs alcohol differently case by case, person to person. The only thing that we can be sure of is how long after a person's last drink that the body has absorbed all of the alcohol that has been taken in. And that's usually about an hour. We could be liberal with it and say an hour to an hour-and-a-half just to be sure, but it's usually within an hour after you stop drinking your last drink that your body has no more alcohol in your stomach to absorb. So by that time, all the—all the alcohol that you have taken in is now circulating through your bloodstream, and your body is working to eliminate it, get rid of it.

In other words, she said, a person will reach their "peak" alcohol blood content about sixty to ninety minutes after having their last drink. Asked what would be happening between 9:00 p.m. and 12:30 a.m. if a person had their last drink at 6:00 p.m., Stump said, "The blood alcohol concentration would be decreasing as your body eliminates the alcohol." Stump was asked whether a BAC of .108 "for a standard person," "correlates to about five drinks remaining being processed by—in the blood," and she answered, "Yes, approximately five drinks, give or take a little bit on either side." She agreed when asked on cross-examination whether experts in the field had cautioned against relying on "[g]eneral averages" because there are "fluctuation[s] from one person to another." The only point at which appellant objected to Stump's testimony was when the State asked whether a BAC of .108 told her "anything about . . . the amount of drinks remaining in the body at the time of" the test. The trial court sustained the objection.

After the State rested and the trial court denied appellant's motion for directed verdict—arguing that the State had not proven that appellant was intoxicated at the time of the accident—Brian Andrews, who co-owns an accident-reconstruction company, testified on appellant's behalf. He explained that he modeled the collision after reading police reports, watching the gas-station video, and going to the scene of the accident. According to his model, Weissman was short of the intersection and in the right-turn-only lane when his light turned red but still proceeded straight into the intersection. Andrews also testified that from the time

10

Weissman's car crossed the "stop bar," the line before an intersection where vehicles are supposed to stop for red lights, it was "2.1 seconds to impact." According to Andrews, "[Y]ou have 2.1 seconds from when you could see the vehicle to when the impact occurs. And in a scenario like this, the average driver will react in 1.4 to 1.9 seconds." Thus, he said, appellant would have had between 0.2 and 0.7 seconds to brake or try to steer away from Weissman's car, "[a]nd the collision would still have occurred," meaning "the collision is unavoidable for the Dodge under the initial circumstances created by the Honda, and the driver's [perception response time] had little to no effect on the collision." In other words, he testified, "There's no reasonable maneuver an average driver could do to avoid the collision." Andrews also determined that because the lights in that intersection are timed so that "every light is red for one-and-a-half seconds" during light changes, appellant was "partially across the stop bar," where he should have stopped, but had "not yet reached the lateral lines of the intersection when his lights turned green." He conceded that appellant would have seen only red lights as he approached the intersection, that appellant was traveling forty-five miles an hour as he drove into the intersection, and that he was halfway over the stop bar before his light turned green. Andrews summarized his testimony about whether both appellant and Weissman had crossed their respective stop bars when they should have stopped as follows: "The testimony is that the Dodge was partially across, and then the Honda has not crossed the stop bar at all." He believed that the Dodge was "in a bit of a gray area of the traffic code. It's beyond the stop bar, but it's not in the intersection."

During closing arguments, the trial court sustained appellant's objections to the State's assertions (1) that appellant's BAC was "either more or much more" than .108 at the time of the accident and (2) that "we know at a minimum his BAC was .108 six hours [sic] after the

11

accident. We don't know what it was at the time, but we certainly know it was higher." The court also instructed the jury to disregard the argument, as requested by appellant. The trial court overruled appellant's objection to the State's argument that BAC results "depend on when were you drinking and when were you tested because you know that after you drink the alcohol doesn't stay in your system forever." It also overruled his objection to the State's statement that appellant's BAC "couldn't have been less than .108."

## DISCUSSION

Appellant raises two issues on appeal: that the trial court abused its discretion by improperly admitting retrograde-extrapolation testimony by Stump and that the evidence is insufficient to prove that appellant was intoxicated at the time of the accident.

*Retrograde Extrapolation*

Appellant argues that the trial court abused its discretion by allowing Stump to testify that, if a person's last drink was at 6:00 p.m. and their BAC at 12:30 a.m. was .108, their BAC at 9:00 p.m. could not have been lower than .108, characterizing that as improper retrograde extrapolation. The State argues that appellant did not preserve the error, that Stump's testimony did not amount to retrograde extrapolation, and that any error was harmless. We will assume without deciding both that appellant preserved the issue and that Stump did provide retrograde extrapolation testimony. On this record, however, the error was harmless.

The erroneous admission of retrograde-extrapolation testimony is not constitutional error. *Bagheri v. State*, 119 S.W.3d 755, 762-63 (Tex. Crim. App. 2003). Thus, we must disregard the error if, after examining the full record, we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365

12

(Tex. Crim. App. 2001); *see* Tex. R. App. P. 44.2(b). The question is "whether the erroneously admitted testimony might have prejudiced the jury's consideration of other evidence or substantially affected their deliberations." *Bagheri*, 119 S.W.3d at 763. We do not simply conduct a sufficiency review but instead review the entire record, including testimony, jury instructions, each side's theories, their closing arguments, and voir dire, if applicable. *Id.* We "consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert." *Id.*

Stump was called as an expert on blood analysis, but her status as an expert was not overly emphasized by the State. Moreover, her testimony was cumulative in the sense that there was other significant evidence of appellant's intoxication at the time of the accident—his erratic driving, his racing across the bridge into the eastern intersection, his decision to flee the scene, and his admission of having drunk throughout the day. *See Douthitt v. State*, 127 S.W.3d 327, 338 (Tex. App.—Austin 2004, no pet.); *see also Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt.").

Although appellant argues that the State placed great emphasis on Stump's testimony in its arguments, the record does not support that assertion. The State did refer to appellant's BAC level and Stump's testimony in closing arguments, as did defense counsel, but it did not place great emphasis on her testimony, essentially reminding the jury that appellant tested at above the legal limit three hours after the accident and six hours after he claimed to have stopped drinking. Instead, the State emphasized the testimony given by the various witnesses—that appellant was seen swerving in his lane, that he revved his engine at the light, that he raced ahead when the first light turned green and at least started into the second intersection on a red light, and that he was going about forty miles an hour when he crossed into

the intersection. It noted that appellant had admitted to drinking six beers and claimed to have stopped drinking three hours before the accident, and it placed heavy emphasis on the fact that appellant fled the scene, hiding in bushes when he saw the police and calling his girlfriend to say his truck had stalled out and to ask her to pick him up on the side of the road. And last, the State emphasized the fact that appellant had been convicted of driving while intoxicated three times in the past. In addition, the two times during closing arguments that the State said appellant's BAC would have been "much higher" than .108, appellant objected, and the trial court sustained the objection and instructed the jury to disregard the statements.

Moreover, appellant did not present any evidence or argument that he drank anything after the accident so as to explain his heightened BAC results three hours after the accident—he argued that the State did not prove he was intoxicated at the time of the collision and that the accident was entirely Weissman's fault. The jury was shown a video of the accident, which shows appellant entering the intersection very soon after Weissman's light turned red and going fast enough to cross the intersection and strike the sedan with enough force to drive it sideways at a speed Gooding estimated as being between thirty-six and forty miles per hour. Several witnesses estimated that appellant was going forty or forty-five miles an hour when he hit Weissman's car, and appellant's own expert testified that appellant was driving forty-five miles an hour as he approached the intersection, at which time he would have seen a red light, halfway crossing the stop bar before Weissman's light turned red.

As in *Douthitt*, the challenged testimony came from an expert, "but there is no indication that the jurors were predisposed to give such testimony greater weight than the other evidence before them," and the retrograde extrapolation testimony "was cumulative of other evidence of intoxication and was not given special emphasis by the State." 127 S.W.3d at 339.

14

And although the State did remind the jury about Stump's testimony during closing arguments, it "did not claim special expertise for [Stump] or suggest that [her] testimony was alone sufficient to convict." *Id.* Given the strength of the State's case and the "relative weakness of appellant's defensive theories," we conclude with fair assurance that the retrograde extrapolation testimony at most had a slight effect on the jury. *See id.* We overrule appellant's first issue on appeal.[2] *See Trevino v. State*, No. 03-16-00017-CR, 2017 WL 4900496, at *7 (Tex. App.—Austin Oct. 27, 2017, no pet.) (mem. op., not designated for publication); *Douthitt*, 127 S.W.3d at 339.

### Sufficiency of the Evidence

Appellant argues that the evidence is insufficient to establish that he was impaired at the time he was in the accident.[3] We disagree.

In considering the sufficiency of the evidence, we ask whether a reasonable juror could have found each element of a criminal offense beyond a reasonable doubt, deferring to the jury's determinations as to witness credibility, the weight to be given to the evidence, and the

---

[2] Appellant makes an additional argument related to the Kyle Police Department's handling of blood taken from Weissman and appellant for alcohol and drug testing, which required a box of vials of blood to be relabeled with the correct name, asserting,

> It is not known what effect these incidents had on the jury and its deliberations regarding the reliability of the Kyle Police Department's handling of the evidence in this case, but the testimony of Ms. Stump could have deflected any negative impressions left upon the jury by the Kyle Police Department's conduct.

However, we fail to see how Stump's testimony, related solely to her findings after testing the blood labeled as appellants, would have influenced any concerns the jury might have had about the separate issue of how the blood samples were handled.

[3] Appellant challenges only the finding that he was intoxicated. *See* Tex. Penal Code § 49.01(2) (defining "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body" or "having an alcohol concentration of 0.08 or more").

resolution of any evidentiary conflicts. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Clayton*, 235 S.W.3d at 778. We consider all of the evidence the jury was allowed to consider, regardless of whether it was rightly or wrongly admitted; view that evidence in the light most favorable to the verdict; and presume that the jury resolved conflicting inferences and issues of credibility in favor of its verdict. *Id.*; *Demond v. State*, 452 S.W.3d 435, 445 (Tex. App.—Austin 2014, pet. ref'd). We will not overturn a verdict unless we determine that it is irrational or not supported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W. 2d 839, 846 (Tex. Crim. App. 1991).

As noted above, several witnesses testified that appellant swerved in his lane and drove erratically. Smucker and Valerio were both concerned that appellant might be impaired, and Smucker changed lanes to avoid following appellant, thinking that would be safer. Reyes testified that appellant was revving his engine as he waited at the red light on the west side of the intersection, and several witnesses testified that appellant took off from that light at high speed, racing toward the eastern intersection where he collided with Weissman, despite those lights being timed so that driving at a moderate speed would allow the second light to safely turn green. Smucker, Valerio, and Hughley all testified that appellant entered the intersection on a red light, and appellant's expert conceded that appellant crossed the stop bar on a red and that the light only turned green after he was halfway across. Appellant was estimated to be driving between thirty-six and forty-five miles an hour at the time he struck Weissman's car, striking the car hard enough to cave in its side more than a foot into the passenger compartment. Witnesses in the area did not hear any sounds of braking before the collision, nor did the police find evidence that

appellant had tried to slow down. After appellant parked his truck, rather than checking on the car he had hit or providing law enforcement with his information, he fled the scene on foot, calling his girlfriend to pick him up but never telling her he had been in the accident. Although no other officers testified that they saw signs that appellant was intoxicated, Akers testified that appellant smelled of alcohol and told another officer that he "reeked" of it. Appellant admitted to the police that he had drunk six beers during the day, although claiming that he stopped drinking at 6 p.m., and initially denied having driven his truck that day and attempted to tell the police officers that his truck had been stolen. And the test results showing that appellant's BAC was over the legal limit three hours after the accident were relevant, circumstantial evidence that appellant had consumed a large quantity of alcohol before the accident; the test results tended to show that appellant was without normal use of his mental or physical faculties at the time of the accident due to excessive alcohol consumption, and his erratic driving leading up to the accident and his decision to flee the scene also were relevant to that question. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App.2010) (even absent retrograde extrapolation testimony, alcohol-level tests are often highly probative to prove both per se and impairment intoxication); *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); *Neale v. State*, 525 S.W.3d 800, 811 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Douthitt*, 127 S.W.3d at 336.

Any issues related to witness credibility or the resolution of evidentiary conflicts are left to the jury as trier of fact, and we will assume that the jury resolved such issues in favor of its verdict. *Clayton*, 235 S.W.3d at 778; *Demond*, 452 S.W.3d at 445. Given the full picture of the evidence presented to the jury, we hold that a reasonable juror could have found beyond a reasonable doubt that appellant was intoxicated at the time of the accident, meaning either that he lacked the normal use of his mental or physical facilities due to his having consumed alcohol or

that his alcohol concentration was at least 0.08. *See* Tex. Penal Code § 49.01(2) (defining "intoxicated"). We overrule appellant's second issue.

**CONCLUSION**

We have overruled both of appellant's issues. We affirm the judgments of conviction.

 

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed: July 17, 2024

Do Not Publish