

# NUMBER 13-10-00543-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MICHAEL DOUGLAS CASTOR,                                Appellant,

v.

THE STATE OF TEXAS,                                       Appellee.

### On appeal from the 221st District Court
### of Montgomery County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Vela, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant, Michael Douglas Castor, appeals his conviction for driving while intoxicated ("D.W.I.") when he had two prior D.W.I. convictions, a third-degree felony.[1]

*See* TEX. PENAL CODE ANN. §§ 49.04, 49.09(b)(2) (West Supp. 2010). After a jury trial,

---

[1] Pursuant to a docket-equalization order issued by the Supreme Court of Texas, this case is before us on transfer from the Ninth Court of Appeals in Beaumont, Texas. *See* TEX GOV'T CODE ANN. § 73.001 (West 2005).

appellant was found guilty and sentenced to a term of eight years of confinement in the Texas Department of Criminal Justice, Institutional Division. By a single issue, appellant argues the trial court reversibly erred by admitting retrograde extrapolation testimony from a witness who was not qualified to provide the testimony. We conclude the trial court erred by admitting the testimony from an unqualified witness, but the error was harmless when considered in light of the entire record. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of December 19, 2009, appellant fell asleep in his truck while stopped in the drive-through lane of a Whataburger restaurant in Porter, Texas. At the time, appellant's truck was stopped between the two drive-through windows of the restaurant, blocking the drive-through lane. Deputy Cy Gamble, an off-duty constable providing security for Whataburger, leaned out of the building window and saw appellant awaken, drive out of the drive-through without placing an order, and drive into the connected parking lot of a Kroger grocery store. Next, appellant approached an exit at the far end of the parking lot, then reversed, turned around and returned to the Whataburger parking lot, where he parked and fell asleep again. At approximately 2:10 a.m., while watching appellant, Deputy Gamble reported the incident to the Montgomery County Sherriff's dispatch operator. Deputy Brad Curtis of the Montgomery County Sheriff's Department arrived within fifteen minutes.

Deputy Curtis approached appellant, who was slumped over and asleep in his truck. The driver's window of appellant's pickup was open even though it was a cold night. After several attempts, Curtis was able to wake appellant. Curtis noticed a faint

2

odor of alcohol emanating from the cab of the pickup and the odor became stronger once appellant spoke. Appellant had difficulty removing his driver's license from his wallet and kept removing items other than his driver's license. After his third attempt to remove it, appellant presented his driver's license to Curtis. Appellant initially told Curtis he was "just hanging out." Appellant later explained to Curtis that he was on his way home from a bar where he had consumed alcohol, and that he was now waiting for some food. Appellant, however, had not placed an order at the restaurant.

Curtis asked appellant to exit the vehicle and noticed that his balance was unsteady, though he always managed to catch himself before he fell, and his eyes were "very bloodshot." Curtis also noticed appellant's top eyelid appeared very heavy and that appellant was not able to keep his eyes completely open while speaking. Appellant had difficulty understanding and responding to questions, and he was difficult to understand because his speech was "extremely slurred." Curtis testified appellant's answers to questions were delayed and slow.

Based on his belief that appellant may have been intoxicated, Curtis administered three standardized field sobriety tests. On the walk and turn portion, appellant exhibited each of the four possible clues. Appellant also performed poorly on the one-leg stand test. Deputy Curtis testified that he believed he administered the horizontal gaze nystagmus test incorrectly and did not assign any clues to that portion of the test. Based on appellant's demeanor and poor performance on the tests, he was arrested for driving while intoxicated.

Video of appellant performing the field sobriety tests was admitted into evidence at

trial. The video was consistent with Curtis's description and showed appellant sitting or resting on a patrol car when he was not attempting to participate in the sobriety tests. Deputy Gamble testified that when he first exited his pickup, appellant was bent over, resting his forearms on the tailgate of the pick-up truck.

After appellant's arrest, it became apparent that he was a felony offender and subject to a mandatory blood draw.[2] The blood draw was performed at Memorial Hermann Hospital in The Woodlands, Texas at approximately 4:30 a.m., more than two hours after appellant was seen driving. The test showed appellant had a blood alcohol content of .15 grams of alcohol per 100 milliliters of blood, nearly twice the legal limit.

Robert Prince, the DPS lab technician who analyzed the blood, testified that, based on the general characteristics of "most people," he was "very confident" that a hypothetical person in the same scenario as appellant, would have had a blood alcohol concentration above .08 at the time deputy Gamble observed him driving in the parking lot. Prince's testimony was admitted over appellant's objection that Prince was not qualified to provide retrograde extrapolation testimony.

## II. DISCUSSION

We review a trial court's ruling on the admissibility of scientific evidence under an abuse-of-discretion standard. *See Mata v. State*, 46 S.W.3d 902, 908 (Tex. Crim. App. 2001) (en banc). The science of retrograde extrapolation concerns the computation of a person's blood-alcohol content at the time of driving based on a test result obtained some time later. *Id.* at 908–09. The proponent of scientific evidence has the burden of

---

[2] Section 724.012 of the Texas Transportation Code lists several situations in which a person must give a breath or blood specimen if arrested for D.W.I. *See* TEX. TRANSP. CODE ANN. § 724.012 (b), (c) (West Supp. 2010).

4

demonstrating by clear and convincing evidence that the evidence is reliable.   *Id.* at 908. This is accomplished by showing the validity of the underlying scientific theory, the validity of the technique applying the theory, and the proper application of the technique on the occasion in question.   *Id.*

The State concedes Prince's testimony is likely inadmissible retrograde extrapolation testimony because the record does not show that Prince was familiar with the nuances of retrograde extrapolation or that he based his testimony on appellant's personal characteristics.   We agree that Prince's testimony—that based on a blood alcohol concentration of .15 approximately two hours after driving, a person in appellant's position would have had a blood alcohol concentration above .08 at the time of driving—was retrograde extrapolation evidence, subject to the *Mata* standard for admissibility.   *See Mata*, 46 S.W.3d at 908–09; *see also Burns v. State*, 298 S.W.3d 697, 702 (Tex. App.—San Antonio 2009, pet. ref'd) (concluding expert testimony, given in response to the State's hypotheticals, that signified criminal defendant's blood alcohol level would have been at least .10 while driving was retrograde extrapolation evidence subject to *Mata* analysis).   Thus we review the testimony under the *Mata* standard to determine whether the trial court erred in admitting it and if so, whether the error was harmful.

**A. Did the Trial Court Err by Admitting Prince's Retrograde Extrapolation Testimony?**

In *Mata*, the Texas Court of Criminal Appeals examined the issue of the admissibility of retrograde extrapolation evidence.   *See Mata*, 46 S.W.3d at 908–14. The court explained critical concepts in retrograde extrapolation including the absorption

and elimination phases of alcohol concentration in the blood and the elimination rate of blood alcohol. *See id.* at 908–09. The court concluded that the clarity with which an expert could explain and apply retrograde extrapolation was significant to determining the reliability of the evidence:

> We believe that the science of retrograde extrapolation can be reliable in a given case. The expert's ability to apply the science and explain it with clarity to the court is a paramount consideration. In addition, the expert must demonstrate some understanding of the difficulties associated with a retrograde extrapolation. He must demonstrate an awareness of the subtleties of the science and the risks inherent in any extrapolation. Finally, he must be able to clearly and consistently apply the science.

*Id.* at 916.

The *Mata* Court reviewed the retrograde extrapolation testimony before it and explained that the expert witness had failed to explain the theory of retrograde extrapolation to the trial court with any clarity, his opinion was self-contradictory, and he seemed unaware of the subtleties inherent in any retrograde extrapolation calculation. *Id.* at 914. Most notably, the expert did not explain the basis of the blood alcohol elimination rate he applied to conclude the defendant was intoxicated at the time of driving, and the rate he applied was greater than the generally accepted average elimination rate. *Id.* at 914–15.

Here, as in *Mata*, Prince demonstrated an inability to apply and explain retrograde extrapolation with clarity and did not show an appreciation of the subtleties inherent in extrapolation. In the State's hypothetical, the person left a bar at 2:00 a.m. and was seen driving at about 2:10 a.m. with a single blood draw about two hours later. Prince admitted he knew no personal characteristics of the driver or the circumstances of his alcohol consumption. Prince admitted that, as a result, he could not determine the

6

person's exact blood alcohol concentration at the time of driving because he lacked sufficient information. Moreover, in explaining his conclusion that the person must have had a blood alcohol concentration over .08 at the time of driving, Prince made no reasoned allowance for the fact that the hypothetical person could have been in an absorption phase at the time he was seen driving, with an increasing blood alcohol concentration, rather than a decreasing blood alcohol concentration. Specifically, Prince testified "most people" reach their maximum concentration about an hour after consuming the last drink and then the body starts to eliminate alcohol. He then opined that, "based on the information I was given and what is written on the submission form, a two-hour difference between twice the legal limit and working two hours backwards, it doesn't seem realistic for an individual to be below a .08." Finally, Prince offered no testimony on the rate at which alcohol is eliminated from the body.

Under *Mata*, we hold Prince's testimony was not reliable because Prince was not able to properly apply and explain the science of retrograde extrapolation in this case. *See id.*; *see also Burns*, 298 S.W.3d at 703 (holding trial court erred by admitting retrograde extrapolation testimony based on speculative premise that the defendant's blood alcohol concentration must have been decreasing between time of driving and subsequent breath test). We agree with appellant that the State did not demonstrate Prince was qualified to render the retrograde extrapolation opinion he provided.

**B. Was the Trial Court's Error Harmful to Appellant?**

The erroneous admission of retrograde extrapolation testimony is non-constitutional error subject to a harm analysis. *Bagheri v. State,* 119 S.W.3d 755,

7

762–63 (Tex. Crim. App. 2003); *see also Martinez v. State*, 155 S.W.3d 491, 495–96 (Tex. App.—San Antonio 2004, no pet.); *Douthitt v. State*, 127 S.W.3d 327, 333 (Tex. App.—Austin 2004, no pet.). Therefore, we must disregard the trial court's error in admitting Prince's retrograde extrapolation testimony unless it affected appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). An appellate court may not reverse a judgment for non-constitutional error if the court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Solomon v. State,* 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). We must consider the entire record, including testimony, evidence, voir dire, closing arguments, and jury instructions to determine whether the jury was affected. *Bagheri,* 119 S.W.3d at 763; *Motilla v. State,* 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). We should also consider the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. *Bagheri,* 119 S.W.3d at 763.

Appellant argues the State emphasized Prince's retrograde extrapolation testimony. We disagree. Though Prince testified as an expert, our review of the entire record leads us to conclude that the trial court's error was harmless. We note at the outset that the defensive theory was that appellant was intoxicated, but made a good choice by parking in the Whataburger parking lot rather than driving home to his nearby apartment. The State emphasized and primarily argued intoxication by impairment of appellant's mental and physical faculties.

8

Retrograde extrapolation evidence was not mentioned or alluded to in voir dire. Most of the State's voir dire focused on what types of behavior and physical signs would show a person is intoxicated. The State explained it could prove D.W.I. by showing a person lacked the normal use of his mental or physical faculties by reason of the introduction of alcohol into the body or by showing a blood alcohol concentration of .08 or more. The State asked the prospective jurors if they understood this and if they agreed the State could prove intoxication in one of three ways. Twice prospective jurors brought up the .08 blood alcohol level as proof of intoxication, and the prosecutor then engaged in very minimal discussion of the legal blood alcohol limit, asking whether jurors thought this was a lenient standard and whether blood alcohol levels should be stated to the third decimal place. Next, the prosecutor discussed that a person arrested for D.W.I. who has two prior D.W.I. convictions, is subject to a mandatory blood draw. The record shows at least two jurors expressed concern over the mandatory blood draw to which appellant was subjected because they believed it meant a person could be unfairly targeted for conviction on the basis of prior behavior. Overall, the prospective jurors did not indicate they would give special weight to blood alcohol evidence.

In its opening statement, the State did not reference retrograde extrapolation evidence. The State emphasized Deputy Gamble's observations of appellant in the Whataburger drive-through lane and the Kroger parking lot. The State also devoted a considerable portion of its opening to describing Deputy Curtis's observations that appellant was intoxicated. The prosecutor also mentioned the video that showed appellant performing the field sobriety tests, that Deputy Curtis learned at the scene

9

appellant had two prior D.W.I. convictions, and that the result of the mandatory blood draw showed appellant had a .15 blood alcohol concentration.

Appellant's trial counsel made his opening statement immediately after the State opened. Counsel set forth that parking in a safe place is the best thing to do when "you realize maybe you had" too much alcohol to drink. Counsel emphasized the evidence would show appellant was not operating his vehicle and he was not guilty because he consciously made a decision not to drive.

Significantly, most of the testimony concerned Deputies Gamble and Curtis's observations of appellant's intoxicated behavior. The State also showed the jury the thirteen-minute video of appellant's poor performance on the field sobriety tests and presented evidence of appellant's two prior D.W.I. convictions. Prince's extrapolation testimony was short and minimal compared to Gamble and Curtis's testimony. The record shows the retrograde extrapolation testimony was cumulative in the sense that there was other significant evidence that appellant was intoxicated at the time he drove.

The jury was charged only on D.W.I. by impairment and not on D.W.I. as proven by blood alcohol concentration. The State did not mention Prince's extrapolation testimony in its initial closing argument. In his closing argument, appellant argued he was "like a fish out of water" and could not be convicted because he did not drive. Though the State had not mentioned blood alcohol concentration in its initial closing, defense counsel predicted the State would argue this point in its rebuttal. Appellant argued that because he did not drive there was no need to consider "the blood." In his closing, trial counsel also argued there was no reason to arrest appellant for D.W.I., but "[t]hey could have

10

[arrested him] for public intoxication."

In its rebuttal, the State explained appellant was seen driving in a public place and then outlined each piece of impairment evidence that showed appellant was intoxicated. This argument included detailed argument concerning appellant's conduct in the parking lot and detailed description of appellant's performance on the field sobriety tests. For example, the prosecutor argued appellant had his window open on a cold night while he was passed out because he felt awful and drunk and needed the fresh air to help him feel better. After discussing the impairment evidence in great detail, the State offered the retrograde extrapolation testimony as a confirmation of the impairment evidence showing intoxication:

> This defendant has not only lost the use of his mental faculties, he lost the use of his physical faculties. And all of that is confirmed based on the blood results of .15 when Bob Prince sat there and told you there is no realistic way that he could have been under .08 at the time of driving based on the facts of this case. I gave him the exact hypothetical.

The State then continued to argue other points and made no further mention of blood alcohol concentration.

Given the State's slight emphasis on the retrograde extrapolation testimony, appellant's defensive theory that he was intoxicated, but did not drive, and the strength of the State's other evidence, we can say with fair assurance that the admission of the retrograde extrapolation testimony had, at most, a slight effect. *See Burns*, 298 S.W.3d at 704; *Martinez*, 155 S.W.3d at 497. We therefore conclude the trial court's error in admitting the testimony was harmless. We overrule appellant's sole issue on appeal.

11

## III. CONCLUSION

We affirm the trial court's judgment.

_____
Gregory T. Perkes
Justice

Do not publish.   TEX. R. APP. P. 47.2(b).

Delivered and filed the
30th day of November, 2011.