**Reversed and Remanded and Memorandum Majority and Dissenting Opinions filed March 21, 2024.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-22-00636-CR

---

### JUSTIN WILLIAM HARDY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 20-CR-3455**

---

### MEMORANDUM OPINION

A jury found appellant Justin William Hardy ("Hardy") guilty of felony driving while intoxicated, assessed his punishment at eight years' confinement and a fine of $2,000, but recommended that his sentence be probated. The trial court suspended the sentence of confinement and placed Hardy on community supervision for eight years. In three issues, Hardy appeals that the trial court erred in: (1) admitting evidence of his blood-alcohol content ("BAC") when the State did

not establish the identity or qualifications of the person who performed the blood draw; (2) failing to suppress evidence of his BAC because the arresting officer lacked reasonable suspicion and probable cause; and (3) permitting retrograde extrapolation testimony from a forensic scientist that was scientifically unreliable. We agree that the trial court erred in admitting retrograde extrapolation testimony and that the error affected Hardy's substantial rights. We reverse and remand for a new trial.

## I. BACKGROUND

Hardy was riding a motorcycle on a highway with a speed limit of forty-five miles per hour when he passed a Santa Fe Police Department officer, Officer Andrew Alvarez, who was traveling in the same direction. Officer Alvarez stopped Hardy for speeding, smelled the odor of alcohol coming from him, and noticed that his eyes were watery. Hardy admitted that he had consumed two to three beers. Because they had stopped on an incline, Officer Alvarez asked Hardy to drive his motorcycle to a nearby parking lot for safety. After Hardy dismounted his motorcycle, Officer Alvarez observed him stagger and walk "heavy-footed." Hardy declined to participate in field sobriety tests, and the officer arrested him for driving while intoxicated and transported him to the police station. At the police station, Hardy refused to give a specimen for a blood or breath test. The officer then obtained a warrant and transported Hardy to a nearby hospital for a blood draw. Subsequently, Hardy's blood specimen was tested at a Texas Department of Public Safety Crime Lab, and a forensic scientist there determined through gas chromatography that the BAC in the blood specimen was 0.178 grams per 100 milliliters of blood.

At trial, Hardy stipulated that he had two prior offenses for driving while intoxicated that occurred in 2007 and 2012. A jury found Hardy guilty of felony

driving while intoxicated. This appeal followed.

## II. MOTION TO SUPPRESS BLOOD SPECIMEN

In his first issue, Hardy argues the trial court erred in admitting the BAC results of his blood specimen because the State did not prove that the woman who drew Hardy's blood was among those authorized to do so by Texas Transportation Code § 724.017. At trial, Hardy moved to suppress the results of the blood sample on this basis, but the trial court denied Hardy's motion.

We review a trial court's ruling on a motion to suppress for an abuse of discretion using a bifurcated standard. *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We defer to a trial court's findings of fact that are supported by the record. *Shepherd*, 273 S.W.3d at 684. We review de novo legal questions and mixed questions of law and fact that do not turn on credibility and demeanor, such as facts that would establish probable cause. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

> Section 724.017(a) states:
>
> (a) Only the following may take a blood specimen at the request or order of a peace officer under this chapter:
>
> > (1) a physician;
> >
> > (2) a qualified technician;
> >
> > (3) a registered professional nurse;
> >
> > (4) a licensed vocational nurse; or
> >
> > (5) a licensed or certified emergency medical technician-intermediate or emergency medical technician-paramedic authorized to take a blood specimen under Subsection (c).

3

Tex. Transp. Code Ann. § 724.017(a). Chapter 724 of the Texas Transportation Code, which contains Texas's implied consent statutes, governs the State's ability to obtain a breath or blood sample from a DWI suspect when there is no warrant. *State v. Johnston*, 336 S.W.3d 649, 660 (Tex. Crim. App. 2011). Chapter 724 is not applicable when, like here, there is a warrant to draw blood. *Id*; *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002). The trial court, after listening to Hardy's motion to suppress argument, correctly noted that "there was a search warrant in this case, and there's no challenge to the search warrant's validity." We thus conclude that the trial court's denial of Hardy's motion was not an abuse of discretion. We overrule issue one.

### III.   REASONABLE SUSPICION & PROBABLE CAUSE

In his second issue, Hardy contends that Officer Alvarez lacked reasonable suspicion to stop him for speeding and lacked probable cause to arrest him. As a consequence, Hardy contends that his blood specimen was fruit of the poisonous tree and the test results from it should have been suppressed.

### A.   REASONABLE SUSPICION FOR TRAFFIC STOP

Hardy contends that the State failed to prove that Officer Alvarez had reasonable suspicion to stop him for speeding. Specifically, Hardy focuses on a false statement in Officer Alvarez's police report,[1] in which he states that he used mobile doppler to ascertain Hardy's speed of eighty miles per hour.

Under the Fourth Amendment, reasonable suspicion exists when the officer has "specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaging in criminal activity." *Garcia v. State*, 43

---

[1] The police report was not admitted into evidence.

4

S.W.3d 527, 530 (Tex. Crim. App. 2001). This is an objective standard that disregards the subjective intent of the officer and requires only some minimal level of justification for the stop. *Wade v. State*, 422 S.W.3d 661, 668 (Tex. Crim. App. 2013).

There is sufficient evidence that Hardy was speeding to support a determination by the trial court that Officer Alvarez had reasonable suspicion for the traffic stop. The State's evidence included video footage from the officer's dash camera. The footage shows Officer Alvarez accelerating after a traffic light turned from red to green. Ten seconds later, and just as Officer Alvarez was driving by a speed limit sign, Hardy drove quickly past Officer Alvarez. Officer Alvarez testified that he was driving the forty-five miles per hour speed limit, in the same direction of traffic as Hardy, and that Hardy "passed me at a high rate of speed on a motorcycle," at least double the officer's speed. Officer Alvarez thus estimated Hardy's speed based on his own speed. A police officer's observation of speeding gives reasonable suspicion for a traffic stop. *See Icke v. State*, 36 S.W.3d 913, 915–16 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (concluding police officer's observation of appellant's speed, though confirmed by radar, rose to the level of reasonable suspicion for traffic stop); *see also Yoda v. State*, 630 S.W.3d 470, 477–79 (Tex. App.—Eastland 2021, pet. ref'd) (addressing reasonable suspicion based on police officer's observation of appellant's speed).

Although Officer Alvarez admitted to falsely stating in his police report that he used mobile doppler, we give almost total deference to the trial court's determination of historical facts that the record supports, especially when based on an assessment of credibility and demeanor. *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018); *Furr v. State*, 499 S.W.3d 872, 886 (Tex. Crim. App. 2016). Because we defer to the trial court if its ruling is reasonably supported by

the record and correct under any theory of law applicable to the case, *State v. Dixon*, 206 S.W.3d at 590, Officer Alvarez's admitted untruth about the mobile doppler does not negate the reasonable suspicion raised by the dash cam video and the officer's personal observation of Hardy's speed.

We thus conclude that the trial court did not abuse its discretion in overruling a motion to suppress for lack of reasonable suspicion for the traffic stop.

## B. PROBABLE CAUSE FOR ARREST

Next, Hardy contends that the trial court should have suppressed evidence of his blood specimen because Officer Alvarez did not have probable cause to arrest him. The Fourth Amendment guarantees that individuals shall be free from unreasonable searches and seizures, and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question, and the arrest falls within one of the exceptions set out in the Code of Criminal Procedure." *State v. Martinez*, 569 S.W.3d 621, 628 (Tex. Crim. App. 2019).

When a defendant seeks to suppress evidence based on an alleged Fourth Amendment violation, the defendant initially bears the burden of proof to show a constitutional violation. *Id.* at 623–24. The defendant meets his initial burden by establishing that a search or seizure occurred without a warrant. *Id.* at 624. If the defendant meets this burden, the burden then shifts to the State to produce a warrant or show the reasonableness of the search or seizure. *Id.* An individual is arrested when he or she has been actually placed under restraint or taken into custody. Tex. Code Crim. Proc. Ann. art. 15.22. Here, it is undisputed that Hardy was arrested without a warrant. Thus, the burden shifted to the State to show the

6

reasonableness of the seizure. *See Martinez*, 569 S.W.3d at 624.

Probable cause for a warrantless arrest exists if, at the moment the arrest is made, the facts, circumstances, and reasonably trustworthy information known to the arresting officer are sufficient for a prudent officer to believe that an individual has committed or was in the process of committing a criminal offense. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). The test for probable cause is an objective one, unrelated to the arresting officer's subjective beliefs, and requires a consideration of the totality of the circumstances that the arresting officer must consider. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). Probable cause for a warrantless arrest may be based on an officer's prior knowledge and personal observations. *Martinez*, 569 S.W.3d at 628. A finding of probable cause requires more than bare suspicion. *Id.* "An unarticulated 'hunch,' a suspicion, or the good faith of the arresting officer is insufficient to support probable cause to justify a warrantless arrest." *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005) (citing *McDougald v. State*, 547 S.W.2d 40, 42 (Tex. Crim. App. 1977)).

Hardy argues that at the time of his arrest, there was insufficient evidence of intoxication[2] to establish probable cause. Hardy contends that Officer Alvarez equivocated in his testimony on whether he believed Hardy was intoxicated at the time of arrest by: (1) conceding "there's not much more than" the odor of alcohol and watery eyes in his initial observations of Hardy; (2) agreeing that odor of alcohol indicates recent consumption, not quantity, and that wind can cause watery eyes; (3) stating he did not observe significant loss in Hardy's physical faculties,

---

[2] The Texas Penal Code defines "intoxication" as either (1) "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body," known as the "impairment theory," or (2) "having an alcohol concentration of 0.08 or more," known as the *per se* theory. Tex. Penal Code Ann. § 49.01(2).

7

including while dismounting the motorcycle; (4) allowing Hardy to drive a short distance to a safer spot to continue the traffic stop, which the officer would not have done if he believed Hardy was intoxicated; (5) stating that he did not consider speed in his conclusion that Hardy was intoxicated; (6) agreeing that Hardy was respectful and not belligerent; (7) observing none of the indicia of intoxication pursuant to motorcycle-specific portions of the NHTSA manual; and (8) placing Hardy under arrest for "suspicion of driving while intoxicated" though he stated he could not "prove it."

The State counters that there was sufficient evidence of intoxication to establish probable cause. Officer Alvarez testified he could smell the odor of alcohol when he approached Hardy, which grew stronger when the men were face-to-face. The officer also testified that Hardy was "heavy footed," staggered after he dismounted his motorcycle, and his eyes were watery. An inference of intoxication is supported by evidence of a person's unsteady balance and the odor of alcohol. *See Kirsch v. State*, 306 S.W.3d 738 (Tex. Crim. App. 2010); *Zill v. State*, 355 S.W.3d 778, 785–86 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding evidence of intoxication includes "slurred speech, bloodshot or glassy eyes, unsteady balance, a 'staggering gait,' and the odor of alcohol on the person or on her breath"). Although Officer Alvarez did not subjectively consider Hardy's speed as a sign of intoxication, excessive speed can be an indication of intoxication. *See Henderson v. State*, 29 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also Tex. Dep't of Pub. Safety v. Gilfeather*, 293 S.W.3d 875, 880 (Tex. App.—Fort Worth 2009, no pet.) (en banc) (op. on reh'g) (concluding "[s]peeding can indicate impaired mental judgment and, therefore, is a factor to be considered as part of the totality of the circumstances" for intoxication); *Tex. Dep't of Pub. Safety v. Varme*, 262 S.W.3d 34, 38 (Tex. App.—Houston [1st Dist.] 2008,

no pet.). Officer Alvarez asked whether Hardy had "had anything to drink tonight?" to which Hardy replied, "Yes, sir." Hardy ultimately admitted to officers at the scene that he had consumed two to three beers. *See Kirsch*, 306 S.W.3d at 745 (stating "admissions by the defendant concerning what, when and how much he had been drinking" are an indicia of intoxication). Hardy also refused to participate in field sobriety tests, which some Texas courts of appeals have concluded may be evidence of intoxication when considered as part of the totality of the circumstances. *See, e.g.*, *Maxwell v. State*, 253 S.W.3d 309, 314 (Tex. App.—Fort Worth 2008, pet. ref'd). Viewing the evidence under the totality of the circumstances, we conclude the trial court did not err in determining there was probable cause for Hardy's arrest for driving while intoxicated. *See Luckenbach v. State*, 523 S.W.3d 849, 857–58 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). The trial court thus did not err in overruling Hardy's motion to suppress the evidence of his subsequently-obtained blood specimen as fruit of the poisonous tree.

Having concluded that Officer Alvarez had reasonable suspicion to make a traffic stop and probable cause to arrest Hardy for driving while intoxicated, we overrule issue two.

### IV. RETROGRADE EXTRAPOLATION

In his third issue, Hardy argues the trial court erred in allowing a forensic scientist, Cheryl Szudlarek, who tested Hardy's blood specimen for its BAC using gas chromatography, to provide opinion testimony about "scientifically unreliable retrograde extrapolation" that was "more prejudicial than probative."

Retrograde extrapolation is the computation of a person's BAC at the time of driving based on the alcohol level found in blood that is drawn some time later. *See Mata v. State*, 46 S.W.3d 902, 908–09 (Tex. Crim. App. 2001). Retrograde

9

extrapolation testimony is a type of scientific evidence. *See Veliz v. State*, 474 S.W.3d 354, 358–59 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). The Texas Rules of Evidence allow admission of an expert's opinion based on scientific knowledge if, among other things, the proponent of the evidence shows by clear and convincing proof that it is reliable. Tex. R. Evid. 702; *see Jackson v. State*, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). Retrograde extrapolation testimony can be reliable if certain factors are known. *Mata*, 46 S.W.3d at 916; *Corley v. State*, 541 S.W.3d 265, 268 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (discussing length of time between offense and testing; number of tests and length of time between them; and extent of the defendant's individual characteristics, such as weight, gender, typical drinking pattern, tolerance, quantity, alcohol and food consumed, and time since the last drink). We review a trial court's admission of such evidence for an abuse of discretion. *Corley*, 541 S.W.3d at 265.

During cross-examination, Szkudlarek testified that she did not know Hardy's BAC at the time he was driving, and she further acknowledged that Texas law requires proof of intoxication at the time the accused was driving. In response, the prosecutor asked in re-direct whether Szkudlarek had learned a process called extrapolation as part of her education and training. After she responded affirmatively, the State began asking her questions about how the body absorbs and eliminates alcohol in the bloodstream. When asked about rate of elimination, Szkudlarek testified that the "standard elimination rate" used within the field is 0.02 grams of alcohol per 100 milliliters of blood per hour. The State then asked Szkudlarek a hypothetical question: "So to be clear, let's say in a situation someone's BAC as far as the test goes was .15 at the time they were driving. An hour later assuming a number of factors but no more alcoholic beverage, their

10

BAC would be. . . ."

Hardy's counsel objected that the State was about to ask the forensic scientist to engage in retrograde extrapolation without having introduced evidence of the *Mata* factors. *See Mata*, 46 S.W.3d at 916. The trial court agreed Szkudlarek could not offer such an opinion because there were "not enough factors for her to make an opinion about this" under *Mata* and *Veliz*. However, the trial court asked of the State: "But that's not what you're trying to do, or is it?" The State confirmed that it was "trying to show . . . the rate of eliminating and what that looks like in an example of a case over the span of one hour, two hours, et cetera." The trial court agreed that such a hypothetical was admissible and allowed the State to continue. The State continued with a re-worded hypothetical question:

> [STATE]: In a hypothetical scenario where someone's BAC was 0.15 at the moment they were driving. An hour later by the process of elimination if no more alcohol has been consumed, what theoretically would their BAC be at?
>
> [SZKUDLAREK]: Assuming that they were already on the decline while they were at that 0.15 at the time of driving, then it would increase to a 0.17.

This hypothetical BAC an hour after driving was close to Hardy's BAC results of 0.178, also taken at some period of time after driving.[3]

In its appellate briefing, the State argues that its hypothetical question was not retrograde extrapolation of Hardy's BAC at the time he was driving. We disagree that the question and the witness's response were distinct from retrograde extrapolation that courts have addressed in other cases. *See, e.g., id.* at 905 (describing expert's testimony "[w]hen given a hypothetical case based on the facts

---

[3] Moments later, the State asked, but withdrew after objection, a second question that used the exact BAC found in Hardy's blood specimen: "If in this case the number that you have at the time of testing was .178, how much time would have to pass through elimination for that BAC to go below .08?"

of this case" that a person's BAC was higher hours after driving but the person was nonetheless intoxicated when driving); *Neale v. State*, 525 S.W.3d 800, 805 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (describing forensic scientist's testimony regarding the average elimination rate of alcohol and extrapolation that appellant's BAC at the time of appellant's arrest was at least 0.19); *Veliz*, 474 S.W.3d at 358 (opinion testimony that an individual with a .081 BAC would have a BAC above 0.08 three and a half hours earlier); *Owens v. State*, 135 S.W.3d 302, 308 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (hypotheticals using appellant's known facts, results of breath test, and varying time of last drink to opine about BAC when driving). Whether an expert calculates the BAC level at the time of driving or at a later time, the expert still conducts an analysis that considers absorption, elimination, and the *Mata* factors. *See Mata*, 46 S.W.3d at 909. Moreover, the State's asking its question hypothetically does not shield the testimony from appellate review. *See id.* at 905 (addressing combination of defendant-specific and hypothetical retrograde extrapolation); *Veliz*, 474 S.W.3d at 358, 362 (same); *Owens*, 135 S.W.3d at 308 (hypotheticals using defendant's known facts); *Douthitt v. State*, 127 S.W.3d 327, 331, 334 (Tex. App.—Austin 2004, no pet.) (hypotheticals).

As this court concluded in *Veliz*, it is error for an expert to conduct an extrapolation about BAC based on elapse of time, without consideration of the *Mata* factors. *Veliz*, 474 S.W.3d at 360–61. Here, the State's question elicited extrapolation testimony from Szkudlarek based on the passage of time (the standard elimination rate of 0.02 grams of alcohol per 100 milliliters of blood per hour) and no further consumption of alcohol. Szkudlarek did not evaluate other *Mata* factors in her response to the State's hypothetical question, and she did not use those factors to explain how she arrived at a higher BAC of 0.17 an hour after

the hypothetical driver tested at 0.15. There is no evidence in the record demonstrating that the State laid a foundation for Szkudlarek's testimony by developing evidence of *Mata* factors. In Hardy's further cross-examination, Szkudlarek then agreed that the science did not support making an extrapolation about a person's BAC based on "a lot" of assumptions. She agreed that without knowing more facts, she could not make such an extrapolation about Hardy. Szkudlarek stated multiple times that she could not testify about Hardy's BAC at the time he was driving. Without establishing the *Mata* factors, the hypothetical extrapolation questions asked by the State and Szkudlarek's response were unreliable, and it was error to admit them. *See id*. at 362.

Erroneous admission of retrograde extrapolation testimony is non-constitutional error. *Bagheri v. State*, 119 S.W.3d 755, 762–63 (Tex. Crim. App. 2003); *Neale*, 525 S.W.3d at 811. We disregard the error if there is fair assurance that it did not influence the jury or had but a slight effect. *Bagheri*, 119 S.W.3d at 763. In this analysis, we consider the entire record, "including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire if applicable." *Id.* at 762. We consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert. *Veliz*, 474 S.W.3d at 362. "Overwhelming evidence of guilt is relevant to this issue, but it is only one factor in the analysis." *Id*. In cases involving intoxication offenses, the issue is whether the erroneously admitted testimony might have prejudiced the jury's consideration of other evidence or substantially affected its deliberations. *Bagheri*, 119 S.W.3d at 763.

From voir dire through closing argument, the State emphasized that it could prove intoxication in two ways:(1) a BAC of 0.08 or higher; (2) or loss of normal

13

use of mental or physical faculties. During voir dire, the State explained to the venire that "[t]his is an important part of the law" and "I want to make sure everyone understands this." The State questioned the venire several times as to whether the State would have to prove a BAC of 0.08 or higher for the defendant to be found guilty. *See Veliz*, 474 S.W.3d at 365 (noting that venire was told in voir dire that there would be evidence of BAC, though no panelist indicated he or she would afford special weight to such evidence).

In opening statements, the State told the jury that it would hear testimony from the forensic scientist about Hardy's BAC and referred back to voir dire where "we talked about the different ways intoxication can be proven." The State told the jury that "I believe you will see and be convinced of a number above 0.08." In closing argument, the State reiterated that "I brought you Cheryl Szkudlarek with the DPS Crime Lab who tested the blood. And I told you that I would bring you a number, and I did. It's over here in evidence. . . . Point one seven eight, twice .08, which is the legal standard for intoxication." The State later argued that "[a]nd then, like I said, beyond the loss of faculties I brought you a number above 0.08." The State then bolstered Szkudlarek's testimony, the testing procedures, and the gas chromatography used, concluding, "There was nothing wrong with the test that [Szkudlarek] did and the results that she brought you yesterday and today." In the final moments of closing argument, the State also argued to the jury that "[t]he evidence is there. The observations of Officer Alvarez leading to extraction of the blood and the results of the blood being 0.178, that's a number that you get in evidence. It's a number you can look at in case you don't believe what [Szkudlarek] said or what I said about that number." This is a similar emphasis to that found in *Bagheri*, in which the prosecutor emphasized from voir dire to closing arguments that there would be scientific evidence from an expert showing

14

a BAC above the legal limit at the time of operating the vehicle—although the expert there had conceded in his testimony that an exact concentration could not be calculated without knowing more about the subject. *Id.*

Moreover, this is not a case in which there is significant or overwhelming evidence of intoxication. Unlike *Douhitt*, in which the defendant had been observed drinking a twelve-pack of beer, sharing a 1.75-liter bottle of whisky-infused punch, and later drinking while driving, 127 S.W.3d at 338, Hardy had admitted drinking a total of two to three beers. *Cf. Bagheri*, 119 S.W.3d at 759 (defendant testified that he consumed three to four drinks total). Officer Alvarez testified he did not observe any significant loss in Hardy's physical faculties. He conceded that Hardy's watery eyes, which the jury could assess from the officer's body camera footage, could have been caused by wind. Officer Alvarez agreed with the statistic in the NHTSA manual that motorcyclists stopped for speeding are likely to be driving while intoxicated only ten percent of the time. From the NHTSA's "excellent clues" about intoxication in motorcyclists, Officer Alvarez conceded that he did not observe "drifting while turning," "trouble with dismount," "trouble with balance at stop," "turning problems," or "weaving." Nor did Officer Alvarez observe the NHTSA's "good clues" of intoxication with Hardy, such as operating without lights on at night," "driving the wrong way," or "evading." He allowed Hardy to drive a short distance farther after stopping him—which the officer conceded he would not have done if he believed Hardy was intoxicated. *Cf. id.* at 764 ("The State's claim that there was 'overwhelming evidence of guilt' is something of an exaggeration.").

Unlike *Neal*, 525 S.W.3d at 813, in which the defense did not present any defense witness who undermined the strength of the State's evidence, and *Douhitt*, 127 S.W.3d at 339, in which the "relative weakness of appellant's defensive

theories" was a consideration, the sole defense witness here, Matthew Chaney, was a forensic toxicologist with a doctorate in chemistry who testified concerning serious errors in the testing of Hardy's blood. Chaney testified as to the malfunction and improper calibration in the DPS Crime Lab's testing instrument, lapses in documenting chain of custody of Hardy's blood specimen in the field and in the lab, incomplete separation of all the volatile portions of a mix solution in conformance with the lab's standards, and scientific best practices during testing of Hardy's blood specimen. He also testified that the color of Hardy's blood in the vials was very notable for decomposition, indicating the possibility that decomposition could have occurred prior to getting to the lab. Because of the deficiencies he found, Chaney testified that "we don't know whether the actual true accurate [BAC] result was reported in this case," there were "questionable results," that "significant issues" [RR 3: 137] prevented ascertainment of Hardy's actual BAC, and that he "would not sponsor the results."

Like *Veliz*, 474 S.W.3d at 367, the jury here sent notes to the trial court. In the first note, the jury asked whether it could use the knowledge of the two nurses who sat on the jury about "how the blood should look"—a reference to Chaney's and Szkudlarek's testimony about the color of Hardy's blood at testing and its decomposition. In the second note, the jury requested a "transcript of Dr. Chaney talking about the five things he found wrong?"—a reference to the deficiencies the defense's forensic toxicologist found that he opined prevented results of Hardy's actual BAC. Hardy thus argues that the jury's notes show that the contrasting opinions from the experts played a significant role in the jury's deliberations. Some five hours after its first note about the BAC testing, the jury returned a guilty verdict. We agree that these jury notes indicate the jury was giving serious consideration to the experts' testimony and the BAC results.

16

After a thorough examination of the entire record in this case, we "cannot say with fair assurance that the erroneous admission of retrograde extrapolation testimony did not influence the jury, or had but slight effect." *See Bagheri*, 119 S.W.3d at 764. Accordingly, we conclude that the error affected appellant's substantial rights. *See Veliz*, 474 S.W.3d at 368. We sustain Hardy's third issue.

## IV. CONCLUSION

Having sustained Hardy's third issue, we reverse the judgment of the trial court and remand the case for a new trial.

/s/    Margaret "Meg" Poissant
Justice

Panel consists of Justices Wise, Zimmerer, and Poissant. (Wise, J., dissenting). Do Not Publish — TEX. R. APP. P. 47.2(b).

17